# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL DAVIS,

        Plaintiff-Appellant,

and

RAQUEL DAVIS,

        Plaintiff,

v

JEFFREY LENHART,

        Defendant-Appellee.

UNPUBLISHED
September 22, 2016

No. 329092
Allegan Circuit Court
LC No. 14-053719-NO

Before: SERVITTO, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

Michael Davis fell and broke his leg while trying to avoid flowing water funneling down a sloped exit path from a haunted corn maze. The circuit court summarily dismissed Davis's premises liability claim, finding the condition open and obvious. In doing so, the circuit court rejected evidence that maze employees directed Davis onto the path as the means to exit the maze, creating a question of fact whether the condition was effectively unavoidable. We vacate the circuit court's summary disposition order and remand for continued proceedings.

## I. BACKGROUND

At some point between 10:00 and 11:00 p.m. on October 12, 2013, Michael Davis went with his wife, Raquel Davis, and four others to the Witches of New Salem haunted corn maze in Dorr Township. (M Davis Dep, pp 9-10, 22.) The corn maze runs from late September through Halloween on farmland owned and operated by Jeffrey Lenhart. (Lenhart Dep, p 5.) The haunted corn maze was designed to be very dark and scary. As noted on <http://www.witchesofnewsalem.com> (accessed July 20, 2016): "Every night is filled with screams at the New Salem Corn Maze!" As described by its owner, "there will be scenes that'll have lights or strobe lights," but "[t]he general maze to walk through, no lights." (Lenhart Dep, p 25.) Participants may use a flashlight and may even purchase one on site (Lenhart Dep, p 25; Osterhout Dep, p 22), but Davis did not do so on the night in question. (R Davis Dep, p 7.)

-1-

When Davis arrived at the corn maze, the weather was dry. (M Davis Dep, p 11.) No signs warned patrons about the terrain inside the maze, and neither did the scripted speech given by the tractor driver who transported customers to the start of the maze. (Lenhart Dep, p 13; M Davis Dep, pp 10, 16; Osterhout Dep, pp 22-23.) While waiting in line to enter the maze, "it began to sprinkle." (M Davis Dep, p 17.) About 30 minutes after Davis arrived, it started to rain and soon became "a downpour." (M Davis Dep, p 21.) Approximately 45 minutes in, Davis "[s]lipped on an incline on the mud in the corn stalks" and "fell on [his] butt." (M Davis Dep, pp 21, 28.) Davis's friends also had trouble maintaining their footing. (M Davis Dep, pp 22-23; R Davis Dep, p 8.) Another 15 to 20 minutes later (M Davis Dep, pp 21, 28), Davis described:

> We came upon an area where there was actually flowing water through the way we were heading. I went to step over that water, I lost my footing and I fell down. I went to stand up, my other leg slid and then I fell down again with my leg still caught. And I came down with all my weight with my leg twisted and broke my [right] leg. [M Davis Dep, p 29.]

Davis later recalled, "The left-hand path was kind of up and over and the area where I needed to step over was flowing water . . . . The water was funneling down towards a washout." (M Davis Dep, p 48.) Davis claimed that he tried to step over the flowing water to get to the connecting path. (M Davis Dep, pp 48-50.)

According to Davis, as the rain grew heavier, "everybody was just trying to find their way out." (M Davis Dep, p 23.) Davis knew of no means to "escape" the maze, there were no signs leading to emergency exits, and Davis believed he had to trudge through to the maze's end. (M Davis Dep, pp 24-25.)

Lenhart admitted that the ground in the corn maze can be slippery. The soil in the field used for the maze is "higher, gravelly or sandier soil" than in his other fields. (Lenhart Dep, p 22.) Lenhart periodically lays down straw or wood bark to "help[] dry it up," but the soil eventually "gets slipperier because of people traffic . . . ." (Lenhart Dep, p 23.) Lenhart denied that the soil was "gumbo clay, greasy, slippery like you're thinking that it is." (Lenhart Dep, pp 22-23.) Shortly before Davis's fall, Lenhart's staff decided to close down the section of the maze housing the injury locus because it was getting too muddy. (Lenhart Dep, p 29; Belanger Dep, pp 11, 13.) Lenhart described that the closed area is "down the hill" and "[w]ater runs downhill." The "hill," however, was really "a gentle slope." (Lenhart Dep, p 32; Osterhout Dep, p 11.) While Davis and his wife contended that a rivulet of water ran through the area, corn maze employee Brian Belanger described the ground at the point of Davis's fall as "slick like a wet soccer field that got muddy in a corner." (Belanger Dep, p 14.)

To close off the subject section of the maze, employees were positioned to divert patrons onto a different path. However, there were "already people in it," including Davis's party. (Lenhart Dep, p 29; Belanger Dep, pp 11, 13.) Davis claimed that when he and his party first entered the maze, employees dressed in costume were everywhere. (M Davis Dep, p 23.) "[W]hen it started raining," however, "they just vanished." (M Davis Dep, p 24.) Mrs. Davis described it as "a no-man land." (R Davis Dep, p 11.) Given the absence of visible employees, Davis did not contemplate "yelling for help" to find his way out. (M Davis Dep, p 27.) Mrs. Davis recalled that there was an employee directing people to the left toward the exit at the

intersection of Davis's fall. (R Davis Dep, p 12.) Mrs. Davis claimed that the employee ignored them before her husband's fall, because he was assisting an intoxicated customer. (R Davis Dep, pp 12-13.) And Davis denied that anyone warned them to watch their step in this area. (M Davis Dep, p 48.) Lenhart and his employees contradicted this testimony, asserting that an employee held Mrs. Davis's hand as she crossed the muddy area and offered the same assistance to Davis, who declined. (Belanger Dep, p 13; Lenhart Dep, p 29; Probst Dep, p 11.)

Lenhart's employees admitted that they directed people out of the maze and onto the very path where Davis was injured. Specifically, Balenger testified that he "set up . . . two spots" to divert traffic. (Belanger Dep, p 11.) The area below Balenger's post "was being closed down" and "[t]he area above me, it was where we were diverting people through." (Belanger Dep, pp 11-12.) At that point, several paths converged. Belanger directed people down "the exit path." (Belanger Dep, p 12.) "All the other ones were dead ends," Belanger asserted, "so that's why we were assisting people down this path." (*Id.*) Belanger continued that "[t]here was only one area" to divert people from the closed-off area. (Belanger Dep, p 13.) And Belanger remembered directing Davis and his party along that route. (*Id.*)

Davis filed his premises liability action on July 18, 2014. (Complaint.)[1] Davis alleged that Lenhart had a duty to maintain his premises in a manner to prevent injury, including by employing "reasonable measures to prevent and remedy the hazards posed by defects where invitees may traverse." (Complaint, pp 2-3.) Davis averred that Lenhart was required "to have in place adequate measures for responding to such conditions." (Complaint, p 3.) Davis further contended that the condition that caused his fall was neither open nor obvious. (*Id.*) Davis took issue with Lenhart's failure to warn of the maze's condition and his design of defective trails within the maze. (Complaint, p 4.)

Following discovery, Lenhart sought summary dismissal of Davis's claim under MCR 2.116(C)(10). (Defendant Jeffrey Lenhart's, d/b/a Witches of New Salem, Motion for Summary Disposition, June 12, 2015.) Lenhart argued that the conditions within the maze were open and obvious and were natural and expected. In relation to lighting, Lenhart argued that the very nature of a "haunted" corn maze required little to no light. To achieve the haunted effect, the maze was open only after dark and "lighting remained intentionally low." Patrons were warned of the low lighting and informed that they could use flashlights. (Brief in Support, p 2.) Lenhart continued:

> Based on the very nature of a corn maze located on farmland, patrons, including Davis, knew that they would be traversing dirt paths, on ground of varying elevation and topography, in between tall rows of corn, and in low lighting at night. Moreover, the entire purpose of a corn maze is to allow individuals to enter at one location, between tall rows of corn that limit your vision and perspective, in order for those individuals to navigate their way out of the maze. Thus, individuals enter with the knowledge that they could be

---

[1] Mrs. Davis filed a derivative action that is not at issue in this appeal

"trapped" or "lost" in the maze—this is of course the supposed attraction of a corn maze. [Brief in Support, pp 4-5.]

Lenhart contended that a reasonable person would understand that the dirt ground would become muddy in the rain. (Brief in Support, p 5.) He thereby urged that every condition complained of by Davis was open and obvious, negating any liability on his part. (*Id.*)

In relation to the "washout" that Davis crossed, Lenhart argued that the condition was open and obvious given that Davis testified that he saw it. (Brief in Support, p 6.) That conditions were ripe for a slip and fall in such a muddy area during a rainstorm was also easily ascertainable. (Brief in Support, p 5.)

Lenhart contended that no special aspect removed the muddy condition in the corn maze from the open and obvious doctrine. The area where Davis fell was not "unavoidable." Although Davis claimed that he felt "trapped" in the maze, he could have turned around and gone back the way he came or chosen a different path at the intersection. (Brief in Support, pp 7-8.) Lenhart made no argument in relation to the other strand of special aspect cases—those where the condition presents a uniquely high likelihood and severity of harm.

Davis challenged Lenhart's summary disposition motion. He first posited that he was completely unfamiliar with the general nature of corn mazes as this was his first visit to such an attraction. (Plaintiff's Response to Defendant's Motion For Summary Disposition and Plaintiff's Counter Motion for Summary Disposition, July 6, 2015, p 3.) Moreover, when Davis's party entered the maze, the ground was dry and no employee gave any instruction beyond forbidding alcoholic beverages inside the maze. (*Id.*) Once it started raining, as conceded by Lenhart, the ground became slippery. And just when employee assistance was required to safely and quickly navigate out of the maze, all employees disappeared, essentially trapping the patrons inside. (Plaintiff's Response, p 4.) Davis conceded that he observed the employee described by Lenhart and his witnesses who was tasked with redirecting patrons from the closed part of the maze. However, Davis accused, that employee ignored his party and assisted only an intoxicated patron. (Plaintiff's Response, p 5.)

Davis further contended that Lenhart admitted the design flaws that caused Davis's injuries. Davis emphasized, but misinterpreted, Lenhart's deposition testimony "that the corn maze is on a gravellier, sandier soil which is like clay and gets 'greasy, slippery.' " Lenhart was aware that part of the maze was carved out in a lower area and that water would pool there when it rained. (Plaintiff's Response, pp 5-6.)

Davis summarized his allegations as addressing the design and construction of the maze, the failure to warn patrons of the danger posed when the maze becomes wet, and the failure to provide "a safe means of egress from the maze in the event conditions change." (Plaintiff's Response, p 7.) He contended that summary disposition of these claims in Lenhart's favor was inappropriate because the conditions were not open and obvious. Davis described the dangers as "hidden" and asserted that Lenhart was aware of the nature and location of these secret traps. (Plaintiff's Response, p 8.) He further urged that the lack of lighting and absence of safe, alternative means of egress were special aspects. (Plaintiff's Response, p 9.) Davis "had no choice but to walk in the muddy, slippery area where he fell as he had no other means of egress

from the corn maze." (Plaintiff's Response, p 10.) And "where a dangerous condition is obscured by darkness, it is plainly not 'obvious'." (Plaintiff's Response, p 11.) As such, Lenhart could not hide behind the open and obvious defense. (Plaintiff's Response, p 12.)

The court heard the parties' arguments on July 13, 2015. At the hearing, Lenhart's counsel summarized his understanding of Davis's complaint:

> What they're saying here is that [1] it's low lighting, well it's a haunted maze, it's going to have low lighting, has to be at dark; [2] it's in a cornfield, so unless you're setting up the corn stalks in the middle of the parking lot normally it's going to be on muddy ground with varying levels of topography and terrain; and [3] then we're also talking about the time of year. It's fall. Fall in Michigan involves precipitation. [H, p 5.]

In response to Davis's complaint about the length of time he roamed without assistance, unable to find an exit, counsel iterated, "the whole point of [corn mazes] is to get lost in there." (H, p 8.) If you added lighting, the attraction would no longer be a haunted maze. If you had to remove mud from the equation, the attraction no longer could be built in a cornfield. Removing the "dangerous" conditions, removed the attraction all together. (H, p 5.) That the nature of a maze is to confuse and distort, does not render the condition "unavoidable" either. (H, p 8.) Lenhart also did not create the hazard, counsel argued. Although "[h]e intended to build a maze, and a maze in a corn field is going to have hills," that is "just the nature of the land." (H, p 12.) Defense counsel further noted that Davis approached his retort subjectively—what he as a first time visitor should know—when the standard is objective. (H, p 6.) The court inquired of Lenhart's counsel why he had not raised assumption of risk in the summary disposition motion. Counsel indicated that the defense "would necessarily implicate" facts that were in dispute. (H, p 15.)

During Davis's rebuttal, the court queried whether Davis had the option to stand still until the rain passed or until assistance came. Plaintiff's counsel responded that this was not a reasonable course of action because Davis and his party had not seen an employee for an extended period. (H, p 22.) The court further questioned why Davis did not cut through the corn rows and make his own exit. (H, pp 23-24.) Counsel again opined that such action would have been unreasonable given that Davis did not know the lay of the farmland and could have ended up in the middle of the back fields. (H, p 25.) The more reasonable option, counsel argued, was for Lenhart and his employees to take action: "Turn on some kind of lights, get on a loud speaker and say stay where you are we're going to come find you and get you out of here. We're going to bring flashlights out to you people so you can get out safer or easier." (H, p 24.)

Ultimately, the circuit court ruled in Lenhart's favor and dismissed Davis's lawsuit. The court noted, "In this case the open and obvious danger doctrine is invoked as the impetus for summary disposition." Exceptions to the doctrine, explained the court, "include the presentation to the injured person of a route which makes encountering the risk and transversing [sic] the risk or engaging with the risk effectively unavoidable, or that the risk proposes a substantial risk of death or serious injury or uniquely high severity of harm." (H, p 32.) In relation to the current case, the court could not "rule out that some corn mazes, if they led to a 30 foot pit that's going to absorb in a dead fall some of those unfortunate corn maze travelers who misstep in the dark, I

would find that (inaudible) and not at all comical." In this case, however, the court did not "actually find the risk [Davis] encountered effectively unavoidable" and "while it pose[d] some risk of injury," the court discerned no "risk of death or serious injury or very severe injury." (H, p 33.) In this regard, the court refused to use hindsight to deem the maze unreasonably dangerous simply because Davis was injured. (H, p 34.)

The court then considered the evidence presented by Davis. First, the court recited Davis's admission "that he saw the water he encountered." The court reasoned that Davis "had the option to turn around and go out the other way even though that might have been a longer trip and it would have taken more time and it would have been uncomfortable because it was raining" and acknowledged that such a route "would have had its own risk" and Davis's safety could not have been "perfectly assured." (H, p 34.) The court continued that Davis could have "walk[ed] through the corn field knocking down stalks." (*Id.*) In the court's estimation, that would have been "an objectively reasonable measure that other objectively reasonable people would have taken." (H, pp 34-35.) That Davis had already fallen once "play[ed] a role in addressing objectiveness and reasonableness in this context because having fallen he's on alert to the risk of falling," the court noted. With this knowledge, "an objectively reasonable assessment of risk would have moved the plaintiff at that point to leave the maze, or cry for help when [sic] employees, if they were around." Moreover, the court asserted, "it was always an option to just stand pat and be soaked and maybe annoyed or aggravated but not encounter any risks." The court also acknowledged that the maze was dark and the ground slanted. Although the risk was "intensified by darkness and some degree of incline," the court determined that "the incline was not so radical as I can establish here to present a chute or a ditch similar to the 30 foot ditch mentioned in another precedent." (H, p 35.)

The court proceeded to reason that the dangers faced by Davis are innate to a corn maze.

[B]y its very nature a corn maze has to provide some degree of unfamiliarity with the exact terrain. You're not given a topographical map. . . . That's by very nature of a corn maze part of the excitement and the challenge of that enterprise.

If we reduce every land used for recreational purposes to some artificially sanitized and maneuvered territory that the land owner actively combs to give a perfectly flat well lighted surface, we won't have corn mazes, we won't have haunted houses, we won't have challenging circumstances, and challenging circumstances is exactly what brings the objective and reasonable public to this kind of an enterprise. In fact one could say even though well lighted, that's what brings people out to a golf course when they don't have the skills to really play a high degree of professional golf, they're out there for the challenge and the beauty and the uphill/down dale through sand and marshy territory and so on. There's some limited amount of comparison between a golf course in broad daylight. Certainly the darkness here added something to the risk.

It isn't the darkness itself that's the problem. It's the land owner's failure to put up towering lights he can trigger at a switch or anybody in the maze can trigger, but if they had that capability one person out in the maze would turn off the entertainment for everybody else by hitting the alarm switch or the light bath

-6-

switch similar to a fire alarm. Again, a corn maze can't be operated under those circumstances, it's very nature would be compromised and destroyed by that. [H, pp 36-37.]

Accordingly, the court determined that the particular dangers posed to Davis in the haunted corn maze were open and obvious and were neither effectively unavoidable nor unreasonably risky. (H, p 37.) The circuit court therefore dismissed Davis's suit.

## II. ANALYSIS

We review a trial court's decision on a motion for summary disposition de novo. *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 243; 704 NW2d 117 (2005). . . .

A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate . . . if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).]

Davis's claim sounds in premises liability. Davis, as a paying customer, was an invitee on Lenhart's land.

[A] landowner owes a duty to use reasonable care to protect invitees from unreasonable risks of harm posed by dangerous conditions on the owner's land. Michigan law provides liability for a breach of this duty of ordinary care when the premises possessor knows or should know of a dangerous condition on the premises of which the invitee is unaware and fails to fix the defect, guard against the defect, or warn the invitee of the defect. [*Hoffner v Lanctoe*, 492 Mich 450, 460; 821 NW2d 88 (2012).]

A landowner bears no duty to warn or to protect invitees from dangers that are open and obvious, however. *Id.* at 460-461. "Perfection is neither practicable nor required by the law," and "[u]nder ordinary circumstances, the overriding public policy of encouraging people to take reasonable care for their own safety precludes imposing a duty on the possessor of land to make ordinary [conditions] 'foolproof.' " *Id.* at 460. In determining whether a condition is open and obvious, a court must ask "whether it is reasonable to expect that an average person with ordinary intelligence would have discovered it upon casual inspection." *Id.* at 461. This test is completely objective. *Id.*

Our Supreme Court has recognized a narrow exception to the open and obvious danger doctrine, generally termed "special aspects." Liability attaches "when *special aspects* of a condition make even an open and obvious risk unreasonable." *Id.* (emphasis in original). Special aspects exist when the risk created by a condition on the land qualifies as "unreasonable," i.e., a risk that poses "a uniquely high risk of severe harm." *Id.* at 461-462 (citation omitted). In this vein, "liability may be imposed only for an 'unusual' open and obvious condition that is 'unreasonably dangerous' because it 'present[s] an extremely high risk of severe harm to an invitee' in circumstances where there is 'no sensible reason for such an inordinate risk of severe harm to be presented.' " *Id.* (alteration in original, citation omitted).

An "effectively unavoidable" danger also falls within the ambit of a "special aspect." *Id.* at 463. An "effectively unavoidable" condition is one that is "inescapable," or incapable of being avoided. *Id.* at 468. "[T]he standard for 'effective unavoidability' is that a person, for all practical purposes, must be *required* or *compelled* to confront a dangerous hazard. As a parallel conclusion, situations in which a person has a *choice* whether to confront a hazard cannot truly be unavoidable, or even effectively so." *Id.* at 469 (emphasis in original). This Court has held that a plaintiff must be "effectively trapped" by the hazard for the exception to apply. *Joyce v Rubin*, 249 Mich App 231, 242; 642 NW2d 360 (2002).

The condition in this case was open and obvious. Although this is an objective test, it is important to note that Davis testified that he saw the water funneling down the path. Indeed, Davis actively tried to step over the water, losing his footing in the process. Davis's observation of the condition is strong evidence that others would perceive the water as well.

Davis makes much of the fact that the paths were dry when he first entered the maze, suggesting that he could not have predicted how difficult traversing the maze would become. However, it would have been acutely obvious to a person of ordinary intelligence that the base of the corn maze was a dirt corn field. It is clearly common knowledge that rain turns dirt into mud and that mud is slippery. Davis testified that it began to lightly rain even before he entered the maze, and the weather only got worse as the night wore on. Similarly, it would be obvious to an ordinary person that a corn field, like any other field, is not perfectly flat. Any expanse of landscape has divots, ruts and slopes, rocks, differing soil textures and other obstacles. Lenhart's corn field slowly sloped so one end of the corn maze was slightly higher than the other. The laws of gravity dictate that water flows downhill. Accordingly, that water would flow and pool in the lower areas of the maze was open and obvious.

Overall, that an outdoor recreation area in a natural setting may become wet, muddy, and slippery is simply not surprising. This Court made this very observation in relation to golf courses. See *Canady v Country Club of Lansing*, unpublished opinion per curiam of the Court of Appeals, issued November 16, 2001 (Docket No. 224699); *Odisher v Snow Snake Mountain, Inc*, unpublished opinion per curiam of the Court of Appeals (Docket No. 223764).[2] A reasonable

---

[2] Although unpublished cases of this Court are not binding precedentially, they can be instructive. *Paris Meadows, Inc v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010).

person visiting such an attraction would be mindful of the weather and the impact it would have on the terrain.

We further discern no evidence that this condition was so dangerous as to be excepted from the open and obvious arena. Davis contends that the darkness rendered the muddy and slick condition of the corn maze paths unreasonably dangerous. Defense counsel aptly argues that darkness was an integral part of this "haunted" corn maze. As reasoned by the Louisiana Court of Appeals in *Mays v Gretna Athletic Boosters, Inc*, 668 So2d 1207, 1209 (La Ct App, 1996), "The very nature of a Halloween haunted house is to frighten its patrons. In order to get the proper effect, haunted houses are dark . . . ." So too with a haunted corn maze. And flashlights were permitted in the maze to assist patrons. Davis chose not to use one himself, relying instead on his friends' iPhone flashlight applications. When Davis fell, he had fallen too far behind for those lights to be useful. (M Davis Dep, pp 30-31.) Lenhart was not to blame for that.

Moreover, the wet, muddy condition was not unreasonably dangerous on its own. Rain makes the ground wet and sometimes slippery; this is to be expected. Nothing about this muddy puddle was so unique or "unusual" that it created an unreasonable risk of severe harm. See *Hoffner*, 492 Mich at 461-462.

However, Davis did create a factual question whether the area of his fall was effectively unavoidable. In this regard, Davis argues that Lenhart failed to provide a means of safe egress and insufficient employees were available to guide visitors out of the maze when it began to rain heavily. Davis described that he and his party were essentially trapped in the maze for over an hour in the pouring rain, trying in vain to find their way out. The record evidence supports that employees were present and were actively assisting corn maze visitors toward the exit. However, the path the employees insisted visitors travel was arguably unsafe.

In *Lugo v Ameritech Corp*, 464 Mich 512, 518; 629 NW2d 384 (2001), the Supreme Court illustrated an "effectively unavoidable" condition as follows: "a commercial building with only one exit for the general public where the floor is covered with standing water. While the condition is open and obvious, a customer wishing to exit the store must leave the store through the water." Consistent with *Lugo*, this Court held that an effectively unavoidable condition must "trap" the plaintiff to overcome an owner's open and obvious defense. *Joyce*, 249 Mich App at 242.

Here, Lenhart's employees testified that they closed a section of the corn maze because of the wet conditions. The employees moved to strategic locations to guide patrons out of the maze. Employee Belanger stood at the path intersection where Davis was hurt. He directed traffic down a path that required people to cross the subject area. Belanger even claimed to have held Mrs. Davis's hand as she crossed. (Belanger Dep, p 13.) Belanger directed people in this manner "because this is the exit path. All the other ones were dead ends." (Belanger Dep, p 12.) Considering the evidence in the light most favorable to Davis, as we must when faced with a (C)(10) motion, the flowing water blocked the only means of exit from the corn maze. The

landowner's employees sent Davis directly into the water. This is precisely the scenario described in *Lugo*, 464 Mich at 518, and was more than adequate to overcome summary disposition.[3]

Accordingly, we vacate the summary disposition order and remand for continued proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Deborah A. Servitto
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher

---

[3] Davis also contends that summary disposition was improper because Lenhart created the hazard by designing and constructing the maze on uneven ground, ensuring that people regularly would be required to wallow through the wet low-lying area to navigate the maze. The reality is that Lenhart did not create the incline on the land and the incline caused the water to pool, not Lenhart's maze design. However, Lenhart's employees did create a situation where patrons were required to traverse a slick area of pooled water in order to reach safety.